IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DANIEL BRIGHAM, | * | |
| RICKY HORTON, and | | |
| KOREY STEVENSON, | * | |
| | | |
| Plaintiffs, | * | |
| | | |
| v. | * | Civil Action No. DKC-20-1190 |
| | | |
| COMMISSIONER DAYENA CORCORAN, | * | |
| FRANK BISHOP, | | |
| RICHARD RODERICK, and | * | |
| LAUREN BEITZEL, | | |
| | * | |
| Defendants. | | |

\*\*\*

## MEMORANDUM OPINION

Self-represented Plaintiffs Daniel Brigham, Ricky Horton, and Korey Stevenson, all of whom are inmates presently incarcerated at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, filed the above-captioned civil rights action pursuant to 42 U.S.C. § 1983 against Dayena Corcoran, Frank Bishop, Richard Roderick, and Lauren Beitzel, in their individual and official capacities. ECF No. 1. Plaintiffs allege that Defendants violated their constitutional rights, as well as the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Rehabilitation Act, 19 U.S.C. § 701 *et seq.*, by placing them in Maximum Security II Structured Housing ("Max II SH") without first conducting a psychiatric evaluation to determine whether they are seriously mentally ill ("SMI"). *Id.* at 7-9. Plaintiffs seek monetary damages and injunctive relief. *Id.* at 8-10.

Defendants filed a motion to dismiss or, in the alternative, motion for summary judgment (ECF No. 33), to which Plaintiffs responded (ECF No. 48). No reply has been filed and the time to do so has expired. Both parties submitted exhibits in support of their papers. Having reviewed

the submitted materials, the court finds that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, Defendants' dispositive motion will be granted.

## BACKGROUND

### A. Plaintiffs' Claims

Plaintiffs allege that in June 2017, Commissioner of Corrections Dayena Corcoran[1] directed NBCI to create the Max II SH unit. Compl., ECF No. 1 at 6. Plaintiffs assert that, pursuant to DOC.100.0004(1)(b), an inmate who may qualify for placement in Max II SH shall be referred to the psychology department for a mental health evaluation. *Id.* If the inmate is found to be SMI, he may not be recommended for Max II SH. *Id.*

Plaintiffs claim that they were placed without psychiatric evaluations in Max II SH, where they are denied treatment, services, and applicable programming. *Id.* at 7. According to Plaintiffs, their placement in Max II SH constitutes a violation of their due process rights under the Fourteenth Amendment, their right to be free from unreasonable search and seizure under the Fourth Amendment, their right to be free from cruel and unusual punishment under the Eighth Amendment, as well as their rights under the ADA and Rehabilitation Act. *Id.* at 8-10.

### B. Defendants' Motion

Defendants' motion is itself not a model of clarity. With regard to one plaintiff, Korey Stevenson, they raise the defense of failure to exhaust administrative remedies. With regard to all, they assert that (1) the official capacity claims must be dismissed based on the Eleventh Amendment; (2) the complaint fails to state a claim (although it is not stated in what way the complaint is deficient); (3) there must be personal involvement in order to state a §1983 claim, and

---

[1] According to Defendants, Wayne Hill became the acting commissioner on August 17, 2018, and Dayena Corcoran officially retired on September 1, 2018. Declaration of John White, Correctional Case Management Specialist II, ECF No. 33-5 at ¶5.

2

supervisory responsibility is insufficient; (4) violations of policy and procedures do not provide a basis for a procedural due process claim; (5) there was no denial of mental health care; (6) for the ADA claim, plaintiffs have failed to "demonstrate" that they have a disability and that claims against individuals for money damages are not permitted; and (7) that they are entitled to qualified immunity.

The "factual background" recited by Defendants relies on declarations from Lauren Beitzel, a licensed clinical professional counselor at NBCI and Richard Roderick, a correctional case manager, along with documents certified by records custodians. According to those sources, Facility Directive DOC.100.0004 governs the Max II SH program within the Department of Public Safety and Correctional Services ("DPSCS"). DOC.100.0004, ECF No. 33-3 at 32-48. Inmates are placed in Max II SH if they demonstrate "dangerous, violent, or other characteristics that pose a serious threat to life, property, self, staff, other inmates, or facility security." DOC.100.0004(.04)(B)(5)(a). An inmate who is SMI, however, cannot be housed in Max II SH. DOC.100.0004(.04)(B)(5)(b), both at ECF No. 33-3 at 33.

When an inmate is identified for Max II SH placement, a case management specialist reviews the inmate's performance and progress and refers the inmate to the Psychology Department for a mental health evaluation. DOC.100.0004(.05)(C); ECF No. 33-3 at 34. If the inmate is not determined to be SMI, the case management specialist submits a recommendation to a multi-discipline team ("MDT") that evaluates the inmate's correctional history. *Id.*; *see also* DOC.100.0004(.04)(B)(6), *id.* at 33. If the MDT identifies behavior consistent with that of a Max II SH inmate, the MDT notifies the inmate of the consideration for placement and affords the inmate an opportunity to respond. DOC.100.0004(.05)(C)(4), *id.* at 36. The recommendation is

then sent to the managing official and DPSCS Commissioner for approval. DOC.100.0004(.05)(C)(5)-(6), *id.*

Max II SH consists of four phases with Phase I providing the highest level of custodial supervision and Phase IV providing the lowest.  DOC.100.0004(.05)(F)(1), *id.* at 37.  Each inmate's behavior determines his progress through the Max II SH phases, based on weekly or monthly reviews.  DOC.100.0004(.05)(G), *id.* at 41.  When a Max II SH inmate is deemed to have successfully progressed through the four phases, a case management specialist reviews the inmate's case file for security classification. DOC.100.0004(.05)(G)(5), *id.*  According to Mr. Roderick, Max II SH allows inmates to progress by providing incentive-based activities, programming, and close monitoring.  Decl. of Roderick, ECF No. 33-3 at 2.  It is intended to help inmates conform their behavior to a standard level of confinement for eventual general population. *Id.*

Like all other inmates at NBCI, inmates assigned to Max II SH have access to medical, dental, and mental health care.  *See* Inmate Handbook, ECF No. 33-3 at 25-31.  Inmates access medical services by submitting a Sick Call Encounter form, which is available in each housing unit. *Id.* at 28.  "Those who wish to be scheduled to see a member of the Psychology Department are encouraged to send a written request" to the department with as much information as possible. *Id.* at 26.  Some of the services provided include group therapy, individual therapy, crisis intervention, intake assessments, individual behavioral management plans, security evaluations, and psychological testing.  *Id.* at 25.  Further, appropriate medications may be prescribed and administered by qualified health care personnel.  *Id.* at 26, 29.

Ms. Beitzel states that Mr. Brigham has been housed at NBCI since August 20, 2009, while Mr. Roderick avers that Mr. Brigham has been there since January 28, 2013.  *Compare* Decl. of

Beitzel, ECF No. 33-2 at ¶3 *with* ECF No. 33-3 at ¶3. Ms. Beitzel states that Mr. Brigham had a mental health intake on August 20, 2009, but the findings from that intake are not included in the record. ECF No. 33-2 at ¶4. According to Ms. Beitzel, "Brigham carries a mental health diagnosis," however, the details of that diagnosis are not specified. *Id.* at ¶5. Mr. Brigham had an annual security review in June 2015, at which time he was increased to Max II security. Security Reclassification Instrument ("SRI"), ECF No. 33-3 at 16-17. On February 8, 2018, he was recommended for reassignment to Max II SH, and Commissioner Wayne Hill approved the recommendation on February 20, 2018. Case Management Assignment Sheet ("CMAS"), ECF No. 33-4 at 41-42. On May 3, 2020, Mr. Brigham filed a request for Administrative Remedy Procedure ("ARP") complaining that the Max II SH policy was not being followed. ARP No. NBCI-0916-20, *id.* at 43-45. His chief complaint was that he was not referred to Psychology for evaluation prior to being assigned to Max II SH. *See* Decl. of Roderick, ECF No. 33-3 at ¶16. On July 18, 2019, Mr. Roderick completed a Referral for Psychological Services "to comply with the policy since there was an oversight of doing so prior to his placement." *Id.* Because Ms. Beitzel was on the review team for Mr. Brigham's placement, it had been assumed that the formal referral was not needed. *Id.* It does not appear that the result of that subsequent evaluation, if completed, was included in the record.

     Mr. Horton has been housed at NBCI since June 2014 and had a mental health intake upon his arrival. *See* ECF 33-2 at ¶¶3, 4; ECF 33-3 at ¶3. Like Mr. Brigham, the findings from Mr. Horton's intake are not included in the record. Mr. Horton was increased from Maximum I security level to Maximum II on January 15, 2016. Decl. of Roderick, ECF No. 33-3 at ¶11. On August 9, 2017, he was recommended for reassignment to Max II SH, and the recommendation was approved by the Commissioner on August 17, 2017. CMAS, ECF No. 33-4 at 35-36. The assignment sheet

indicated that "MH [Mental Health] staff [was] contacted and support placement," however, the details of the mental health staff's evaluation is not included in the record.  *See id.*

Ms. Beitzel states that Mr. Stevenson has been housed in NBCI since March 31, 2014, while Mr. Roderick avers that he has been there since May 31, 2014.  *Compare* ECF No. 33-2 at ¶3 *with* ECF No. 33-3 at ¶3.  On September 16, 2015, Mr. Stevenson was increased from Maximum I security to Maximum II.  ECF No. 33-3 at ¶9; SRI, *id.* at 7-8.  He remained at Max II security level until September 6, 2016, when he was reduced to Max I.  *Id.*  On September 28, 2016, Mr. Stevenson was believed to be involved in an altercation that resulted in the death of another inmate.  *Id.*  Thus, he was increased to Max II security level on September 20, 2017.  *Id.*  On May 26, 2020, Mr. Stevenson was assigned to Max II SH following MDT recommendation and a mental health screening by Ms. Beitzel on April 1, 2020.  *Id.*  The details of that screening are not included in the record.

Mr. Brigham filed the instant complaint on May 4, 2020, and Mr. Stevenson moved to join as a co-plaintiff on June 15, 2020.  ECF Nos. 1, 8.  On September 14, 2020, Mr. Stevenson filed an ARP appeal with the Inmate Grievance Office ("IGO") "regarding mental health evaluation prior to his assignment to [Max II SH]."  Decl. of Robin Woolford, IGO Deputy Dir., ECF No. 33-6.  The grievance was dismissed on October 15, 2020.  *Id.*

**STANDARD OF REVIEW**

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the

elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original). The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## DISCUSSION

### A. Exhaustion

Defendants raise the affirmative defense that Mr. Stevenson has failed properly to exhaust his administrative remedies. ECF No. 33-1 at 22-23. If Mr. Stevenson's claims were not properly

presented through the administrative remedy procedure at the time he joined this action, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e.

The Prisoner Litigation Reform Act provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. App'x. 253 (4th Cir. 2004).

Although exhaustion under § 1997e(a) is not a jurisdictional prerequisite, the plaintiff must nonetheless exhaust before this court will hear the claim.  *See Jones v. Bock*, 549 U.S. 199, 215-16 (2007); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).  The exhaustion requirement "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219.  It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase*, 286 F. Supp. 2d at 530.

Because the court may not consider an unexhausted claim, *see Bock*, 549 U.S. at 220, in this very real sense, exhaustion prior to federal suit is mandatory. *Ross v. Blake*, 578 U.S. ___, 136 S.Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S.Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). Importantly, however, the court must ensure that "any defects in exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Moreover, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a); *see Ross*, 136 S.Ct. at 1855. An administrative remedy is not "available" where the prisoner, "through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citing *Aquilar-Avellaveda*, 478 F. 3d at1225); *Kaba*, 458 F.3d at 684.

Inmates housed at an institution operated by DPSCS may avail themselves of the administrative grievance process which is designed for "inmate complaint resolution." *See generally* Md. Code (2008 Repl. Vol.), Correctional Services Article ("C.S."), §§ 10-201 *et seq.*; COMAR 12.07.01.01B(1) (defining ARP). If an ARP is filed and denied, the prisoner may appeal the denial within 30 days to the Commissioner of Correction. If the Commissioner of Correction denies the appeal, the prisoner may file a grievance with the IGO, also within 30 days. OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B. If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing.

C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B.  An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review.  C.S. § 10-207(b)(2)(ii).

Here, it appears that Mr. Stevenson was aware of the administrative grievance process and the process was available to him.  However, he failed to exhaust his administrative remedies prior to filing suit.  In his opposition to Defendants' motion, he claims that he "was unaware that his name was already in the lawsuit" when Brigham filed the initial complaint on May 4, 2020, and thus had no choice but to continue litigation prior to fully exhausting his administrative remedies.  ECF No. 48 at 14.  This argument lacks merit as the court made clear in its initial Order dated May 19, 2020, that Brigham's proposed co-plaintiffs would not be included in the suit unless they returned a signed copy of the complaint.  ECF No. 4.  Thus, Mr. Stevenson had the option of filing his signed complaint only after completion of the ARP process, rather than returning it when he did on June 15, 2020.  *See* ECF No. 8.  Because Mr. Stevenson failed to exhaust prior to filing federal suit, his claims are subject to dismissal.  *See Mitchell v. Stump*, PX 17-2056, 2018 WL 4468855 *5 (D. Md. Sept. 18, 2018) (a prisoner may not exhaust administrative remedies during pendency of suit.)  In any event, should the court allow Mr. Stevenson's claims to proceed, they would fail on the merits, as explained below.

      B.      **Eleventh Amendment**

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from citizen suits in federal court absent state consent or Congressional action.  *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself.  *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).  The State of Maryland has not waived such

immunity for claims brought pursuant to § 1983.  Accordingly, Defendants are immune from suit for actions taken in their official capacities.

### C. Personal Participation

For an individual capacity claim to proceed, a plaintiff must allege sufficient personal participation by each defendant to demonstrate that each defendant violated the prisoner's rights protected under § 1983.  *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001); *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).  A supervisory official cannot be held liable for the acts of a subordinate unless the supervisor's "indifference or tacit authorization of subordinates' misconduct" can be deemed to have caused the injury to the plaintiff.  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  For a supervisor to be found liable for such acts, a plaintiff must prove that (1) the supervisor had actual or constructive knowledge that the subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the subordinate's misconduct; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *Id.* (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Here, Plaintiffs have not alleged any personal participation by Commissioner Corcoran and Warden Bishop.  Plaintiffs have also failed to plead or demonstrate sufficient facts showing supervisory indifference to, or tacit authorization of, any misconduct on the part of these Defendants.  As discussed in the next section, Plaintiffs fail to show that their constitutional rights have been violated.  Accordingly, they necessarily fail to demonstrate that Commissioner Corcoran and Warden Bishop authorized or were indifferent to any alleged violation.  Nor do Plaintiffs'

assertions demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) ("Generally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse."). Therefore, the individual capacity claims against Commissioner Corcoran and Warden Bishop shall be dismissed.

### D. Constitutional Claims

At the core of Plaintiffs' complaint is the claim that they are SMI and Defendants placed them in Max II SH without first conducting psychiatric evaluations to determine whether, due to their disability, they are exempt from Max II SH placement. Plaintiffs assert that in so doing, Defendants violated their due process rights under the Fourteenth Amendment, their right to be free from unreasonable search and seizure under the Fourth Amendment, and their right to be free from cruel and unusual punishment under the Eighth Amendment. The court shall address each allegation in turn.

#### 1. *Fourteenth Amendment*

To the extent Plaintiffs claim that Defendants violated their own Facility Directive by placing Plaintiffs in Max II SH without first conducting a psychiatric evaluation, such a claim does not rise to a constitutional violation. The adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow prison directives or regulations does not, in and of itself, result in a violation of due process. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987); *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *accord Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 (D. Md. 2015), *aff'd*, 644 F. App'x 243 (4th Cir. 2016); *see also Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir. 1990) (citation omitted).

Moreover, even where a state has created internal prison procedures, the procedural protections of the Due Process Clause apply only to actions that implicate a protected liberty interest, such as those that result in the loss of good time credits, *see Ewell v. Murray*, 11 F.3d 482, 488 (4th Cir. 1993), or otherwise lengthen the amount of time an inmate must serve, *see Montanye v. Haymes*, 427 U.S. 236, 242 (1976), as well as those that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 477-78, 483-84 (1995). Plaintiffs do not claim that they lost good time credits or were subjected to an increased sentence. Nor do they assert that they are being denied medical or mental health care that is provided for other inmates at NBCI. Rather, Plaintiffs' sole allegation is that they are "denied treatment, services, and programing [sic]" they believe is "more suitable for their condition." ECF No. 1 at 7. Because this allegation does not implicate a protected liberty interest, Plaintiffs fail to state a valid due process claim.

2. **Fourth Amendment**

Construing Plaintiffs' complaint liberally, it appears that they are asserting a Fourth Amendment violation based on the "seizure" that took place when they were reassigned to Max II SH. *See* ECF No. 1 at 6, 8. The Fourth Amendment protects citizens from unreasonable searches and seizures. *See Terry v. Ohio*, 392 U.S. 1, 8 (1968); *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018). While the Fourth Amendment applies to lawfully confined prisoners, inmates have much more limited privacy interests than those not incarcerated. *Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981); *Hudson v. Goodlander*, 494 F. Supp. 890, 891 (D. Md. 1980).

It is well established that prisoners do not have a constitutional right to demand to be housed in one prison rather than another absent a showing of significant hardship. "[G]iven a valid

13

conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). Courts also should give great deference to decisions made by officials relating to their administration of a prison facility. *Bell,* 441 U.S. at 547. As the Supreme Court has cautioned, "[t]he difficulties of operating a detention center must not be underestimated by the courts." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012).

In light of the foregoing, Plaintiffs' bald assertion that their Fourth Amendment rights were violated when they were transferred to Max II SH fails to state a valid claim.

### 3. *Eighth Amendment*

Plaintiffs also claim that their placement in Max II SHU amounted to cruel and unusual punishment, in violation of the Eighth Amendment. ECF No. 1 at 9. Indeed, the Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const, amend. VIII; *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein,* 825 F.3d 206, 218 (4th Cir. 2016). Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

"[T]to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that the deprivation of [a] basic human need was *objectively* sufficiently serious, and that *subjectively* the officials acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (internal alterations omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot

14

properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).

Here, Plaintiffs have not alleged that they were deprived of a basic human need or that they have suffered any serious injuries as a result of being housed in Max II SH. Thus, they have not established the imposition of cruel and unusual punishment amounting to a constitutional violation.

As Plaintiffs fail to raise a valid claim under 42 U.S.C. § 1983, their complaint will be dismissed.[2]

### E.   ADA & Rehabilitation Act

Lastly, Plaintiffs allege violations of the ADA and Rehabilitation Act. These acts generally are construed to impose the same requirements due to the similarity of their language. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (1999) (citing *Rogers v. Dep't of Health, Envt'l. Control*, 174 F.3d 431, 433-34 (4th Cir. 1999)). Under the Rehabilitation Act, a plaintiff must establish that he was excluded solely by reason of his disability, while the ADA requires only that the disability was a motivating cause of the exclusion. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461-62 (4th Cir. 2012) (citing *Baird*, 192 F.3d at 468-69). To establish a prima facie case under Title II of the ADA or the Rehabilitation Act, the plaintiff must show that: (1) he/she has a disability; (2) he/she was either excluded from participation in or denied the benefits

---

[2] In light of this ruling, the court need not address Defendants' qualified immunity argument.

of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of the disability. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016) (citing *Constantine v. George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).

Here, Plaintiffs have not shown that they are disabled, nor have they shown that they were excluded from receiving medical or mental health treatment at NBCI. As such, they fail to state a claim under both the ADA and Rehabilitation Act, and their complaint must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss or, in the alternative, motion for summary judgment is granted, and Plaintiffs' complaint is dismissed. A separate Order follows.

Date: September 1, 2021

                                             /s/
                                    DEBORAH K. CHASANOW
                                    United States District Judge